# Exhibit A

Electronically
FILED
by Superior Court of California, County of San Mateo
ON 1/20/2026
By /s/ Anthony Berini
Deputy Clerk

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com

*Attorneys for Plaintiff*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF SAN MATEO**

NICHOLAS ROBINSON, individually and on behalf of all others similarly situated,

Plaintiff,

v.

META PLATFORMS, INC.,

Defendant.

Case No. 26-CIV-00466

**CLASS ACTION COMPLAINT**

1. **Violation of the California Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502, *et seq.***

**<u>Jury Trial Demanded</u>**

Plaintiff Nicholas Robinson ("Plaintiff"), on behalf of himself and all others similarly situated, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge:

## NATURE OF THE ACTION

1. This is a class action suit for data privacy violations on behalf of all persons in the State of California who have had biometric information such as their voiceprints accessed, collected, and used without their knowledge or consent while using Facebook and Messenger.

2. Defendant Meta Platforms, Inc. ("Defendant" or "Meta") owns and operates the social media platform, Facebook.

3. Defendant also owns and operates Messenger, a messaging app that can be used for, among other things, instant messages, sharing photos, videos, recording and sending audio recordings, group chats, and video and audio calls.

4. This case involves Defendant's accessing, obtaining, possession, and use of voiceprints and related biometric information from California users of its Facebook and Messenger platforms in violation of the California Comprehensive Computer Data Access and Fraud Act ("CDAFA"), Cal. Penal Code § 502, *et seq*.

5. Under the CDAFA, "any person who … [k]nowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network" is guilty of a public offense. Cal. Penal Code § 502(c)(2).

6. At least since 2025, and for many years prior, Defendant has been capturing, creating, collecting, and storing voiceprints and related biometric information of Facebook and Mesenger users from audio submitted via Facebook or Messenger.

7. Defendant's maze of privacy policies nowhere accurately or fully describes its possession, capturing, collection, creating, obtaining, and use of voiceprints or other related biometric information. While Defendant sought a patent in 2016 (issued in 2020) related to the use

of voiceprints to identify users, which used the term "voiceprint" nearly 200 times, its disclosures to consumers nowhere use the term.

8. Nor does Defendant purport to seek any affirmative consent from users in advance of such access, capture, collection, creation, storage, obtaining, or use of voiceprints or related biometric information.

9. Defendant profits off of the biometric data of Plaintiff and the Class in its possession by using biometric data to improve its voice recognition and identification methods, software, processors, and machine learning; improve its products and product development for hardware and software that utilize voice recognition, such as user authentication features; and using biometric data to identify users so that it can send them customized, targeted content, including targeted advertisements.

10. At its core, Defendant is a digital advertising company. As self-described in its most recent Annual Report filed with the United States Securities and Exchange Commission, "we generate substantially all of our revenue from selling advertising placements on our family of apps to marketers … Marketers purchase ads that can appear in multiple places including on Facebook, Instagram, Messenger, and third-party applications and websites."[1]

11. Defendant also explained in its 2024 Annual Report that it was "making significant investments in AI initiatives, including generative AI, to, among other things, recommend relevant content across our products through our AI-powered discovery engine, enhance our advertising tools and improve our ad delivery, targeting, and measurement capabilities" as a way of mitigating legislative and regulatory developments that have "impacted our ability to use data signals in our ad products."[2]

12. In 2024, Defendant generated over $160.6 Billion in advertising revenue alone, which constituted over 97% of Defendant's total annual revenue.[3]

---

[1] Meta 2024 10-K, p. 7, https://www.sec.gov/Archives/edgar/data/1326801/000132680125000017/meta-20241231.htm.

[2] *Id.* p. 61.

[3] *Id.* p. 72.

13. Ultimately, Defendant profits from the biometric data of Plaintiff and the class by using the biometric data to allow Defendant to target users more effectively with ads and thus sell more of Defendant's main product (targeted advertisements) to Defendant's primary customers (advertisers).

14. Accordingly, Plaintiff brings this action for legal and equitable remedies resulting from these unlawful actions.

**PARTIES**

15. Plaintiff Nicholas Robinson is a natural person and citizen of the State of California. Plaintiff has a Facebook account. On or around October 2025, Plaintiff Robinson used Defendant's Messenger app's audio call feature to speak with an acquaintance. Although unaware at the time, Plaintiff Robinson is informed and believes that Defendant accessed, obtained, and used biometric information, including voiceprints, from his calls. Plaintiff Robinson never gave permission to Defendant to access, obtain, or use his biometric information.

16. Defendant is a Delaware corporation with its principal place of business in California. It is, therefore, a citizen of Delaware and California.

**JURISDICTION AND VENUE**

17. This Court has subject matter jurisdiction over all causes of action alleged in the Complaint pursuant to the California Constitution, Article VI, §10, and is a Court of competent jurisdiction to grant the relief requested. Plaintiff's claims alleged in this Complaint are not preempted by federal law, do not challenge conduct within any federal agency's exclusive domain, and are not statutorily assigned to any other trial court.

18. This Court has personal jurisdiction over Defendant because it is headquartered in this County and Plaintiff's claims arise from that business. The connection between Plaintiff's claims and Defendant's California business operations renders the exercise of jurisdiction by this Court over Defendant appropriate under traditional notions of fair play and substantial justice.

19. Venue is proper in this Court pursuant to Code of Civil Procedure §§395 and 395.5. Defendant resides in Menlo Park and County of San Mateo, Defendant regularly conducts business

in Menlo Park and County of San Mateo, and a substantial portion of the events giving rise to the claims alleged herein occurred in Menlo Park and County of San Mateo.

## COMMON FACTUAL ALLEGATIONS

### I. The California Comprehensive Computer Data Access and Fraud Act

20. The California State Legislature enacted the Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502, *et seq.* in 2001 to "expand the degree of protection afforded to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code § 502(a).

21. The CDAFA makes it unlawful for "any person" to "[k]nowingly access[] and without permission take[], cop[y], or make[] use of any data from a computer, computer system, or computer network, or take[] or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network." Cal. Penal Code § 502(c)(2).

22. "Access," as defined by the CDAFA, means "to gain entry to, instruct, or communicate with the logical, arithmetical, or memory function resources of a computer, computer system, or computer network." Cal. Penal Code § 502(b)(1).

23. "Computer network," as defined by the CDAFA, means "any system that provides communications between one or more computer systems and input/output devices including, but not limited to, display terminals and printers connected by telecommunication facilities." Cal. Penal Code § 502(b)(2).

24. "Data," as defined by the CDAFA, means "a representation of information, knowledge, facts, concepts, computer software, computer programs or instructions. Data may be in any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device." Cal. Penal Code § 502(b)(6).

25. The CDAFA provides a private right of action: "[i]n addition to any other civil remedy available, the owner or lessee of the computer, computer system, computer network, computer program, or data who suffers damage or loss by reason of a violation of any of the

provisions of subdivision (c) may bring a civil action against the violator for compensatory damages and injunctive relief or other equitable relief. Compensatory damages shall include any expenditure reasonably and necessarily incurred by the owner or lessee to verify that a computer system, computer network, computer program, or data was or was not altered, damaged, or deleted by the access." Cal. Penal Code § 502(e)(1).

**II. Defendant Repeatedly Chooses Self-Interest Over User Privacy Interests**

26. Defendant has a troubling history involving user privacy and the misuse of users' personal information, including biometric data.

27. Defendant's practice seems to be to do whatever it needs to do to improve its bottom line, even if that conduct is at the expense of its users' privacy, and deal with privacy invasions after the fact.

28. In 2012, the Federal Trade Commission approved a Consent Order entered with Defendant to resolve charges brought by the FTC that Facebook deceived consumers by telling them they could keep their information private, and then repeatedly allowing it to be shared and made public. *See In re: Facebook, Inc.,* File No. 0923184 (FTC). The 2012 FTC Order required Meta to "not misrepresent in any manner, expressly or by implication, the extent to which it maintains the privacy or security of covered information, including, but not limited to … its collection or disclosure of any covered information." *In re Facebook, Inc.*, C-4365, 2012 FTC Lexis 135, *6 (F.T.C. July 27, 2012). "Covered information" meant "information from or about an individual consumer." *Id.* at *4.

29. In 2019, the United States filed a Complaint for Civil Penalties, Injunction, and Other Relief for Defendant's violations of the 0212 FTC Order, seeking "to hold Facebook accountable for its failure to protect consumers' privacy as required by the 2012 Order and the FTC Act." *See United States v. Facebook, Inc.*, No. 1:19-cv-02184, ECF Dkt. 1, p. 1 (July 24, 2019).

30. The same day, Defendant entered a Stipulated Order, in which it agreed to pay a civil penalty of $5,000,000,000. *Id.* ECF Dkt. 2-1, ECF p. 3. Defendant also agreed to modify the 2012 FTC Order in numerous ways, one of which included specifically listing "biometric information" as an example of "information from or about an individual consumer" in the

definition of "covered information." *Id.* at ECF p. 11. The Modified Order also required Defendant to delete any existing Facial Recognition Templates, clearly and conspicuously disclose in a stand-alone disclosure separate and apart form any privacy policy, data policy, or other similar page, how Defendant would use and share facial recognition templates, and obtain affirmative express consent before creating any new facial recognition templates. *Id.* at ECF p. 16. Further, Defendant agreed to internal procedures, safeguards, and reporting obligations related to the introduction of any "modified product, service, or practice that includes a material change in the collection, use, or sharing of Covered Information; a product, service, or practice directed to minors; or a product, service, or practice involving health, financial, biometric, or other similarly sensitive information." *Id.* at ECF pp. 17-19.[4]

31. On May 3, 2023, the FTC issued an Order to Show Cause alleging violations of the Modified 2012 FTC Order and seeking further modifications. *In re Facebook, Inc.*, File No. 2123091 (F.T.C.).

32. In addition to charges from the FTC, Defendant has previously faced, and settled, civil litigation based on allegations that it allowed third parties, including Cambridge Analytica, to access users' personal information without consent. *See In re: Facebook, Inc. Consumer Privacy User Profile Litig.*, No. 3:18-md-02843-VC (N.D. Cal.).

33. Defendant is currently facing civil litigation alleging that it has collected the health information of Facebook users from third parties without the users' consent. *See, e.g.*, *Doe v. Meta Platforms, Inc.*, No. 5:22-cv-03580-NC (N.D. Cal.).

34. Defendant has previously settled litigation, based on its obtaining scans of face geometry without consent in violation of other state laws. *See In re: Facebook Biometric Info. Privacy Litig.*, No. 15-cv-03747-JD (N.D. Cal.); *Texas v. Meta Platforms, Inc.*, No. 22-0121 (Tex. Ct. [71st Dist.] 2022).

[4] The Stipulated Order was entered by the United States District Court for the District of Columbia on April 23, 2020. *United States v. Facebook, Inc.*, 456 F. Supp. 3d 115 (D.D.C. 2020). Thereafter, the FTC entered its Order modifying the 2012 Order. *In re Facebook, Inc.*, 2020 FTC LEXIS 80, *4 (F.T.C. April 27, 2020).

### III. Beginning in 2016, Defendant Seeks and Obtains Patent Protections for its System of Identifying Facebook Users with Voiceprints, with Updates in 2020, 2022, and 2023

35. In December 2016, Defendant (then Facebook, Inc.) filed a patent application titled: "User Identification with Voiceprints on Online Social Networks."

36. Defendant sought to protect methods, software, and processors for identifying users of its social network with voiceprints created from audio input into the social network site or related applications (*e.g.*, an audio message sent by a Facebook user to another person via Messenger).

37. The patent was issued on March 31, 2020, Patent No. 10,607,148 (the "2020 Voiceprint Patent").

38. The 2020 Voiceprint Patent explained some of Defendant's purposes for obtaining voiceprints, including, (1) to identify users; (2) to associate voiceprints with unknown users; (3) to authenticate users; (4) and to identify users and provide the identified users with customized content.[5]

39. The 2020 Voiceprint Patent explained numerous uses for the methods, software, and processors protected by the patent, including how Defendant can create voiceprints, use them to identify users, and store voiceprints:

> A social-networking system may record and analyze a user's voice to determine a digital voiceprint for the user …. The voiceprint may be received by a client system [e.g. a mobile device], stored on the social-networking system, and used to determine whether subsequently-received audio input is spoken by the same user. The social-networking system may use the voiceprint to identify or authenticate a user based on audio input, and then perform actions based on voice commands in the audio input …. A voiceprint may be generated based on the audio input and stored in the data store as the user's voiceprint.[6]

40. In addition, the 2020 Voiceprint Patent explained that Defendant can create and store voiceprints of its users when audio of them is received, not from the user, but from other

[5] 2020 Voiceprint Patent, p. 4.

[6] *Id.* at 2.

sources (*e.g.*, other users), and that Defendant can utilize its vast data sources to link the voiceprint with a user:

> [T]he social-networking system may receive an audio input from an unknown user who is not associated with a voiceprint, and associate the audio input with a particular social-networking user and a probability that the audio input was spoken by the candidate user. A voiceprint may then be generated for the unknown user based on the audio input and associated with the candidate user and the probability. The candidate user and the probability may be identified by correlating where or when the audio input was received with the candidate user's social-networking information and information about any known users who may be connected to the candidate user in the social-networking system and/or located at or near the location of the candidate user.[7]

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

[7] *Id.* at 3.

41. The 2020 Voiceprint Patent illustrates an example of providing customized content after voiceprint identification of an initially unknown user:[8]




42. The 2020 Voiceprint Patent provided examples showing that "customized content" meant advertisements and other targeted content:

> A client device associated with the social-networking system may detect one or more people speaking, and the people speaking may

[8] *Id.* at Fig. 6.

> be identified as users based on comparison of their voices to voiceprints stored by the social-networking system. Upon identifying one or more of the people as users of the social-networking system, the social-networking system may provide customized content to the identified users based on their social-networking information. The customized content may be personalized to match the interests of the identified users, and may include advertisements, news feeds, push notifications, place tips, coupons, or suggestions.[9]

43. The 2020 Voiceprint Patent also explained that Defendant may receive audio input from an unknown user, which it can compare to voiceprints of Facebook users to identify and target with customized content:

> [T]he social-networking system may receive from a client system at a first location, an audio input from an unknown user…. [T]he social-networking system may identify a first user of the online social network who is proximate to the first location. As an example and not by way of limitation, the online social network may receive the identity of a user proximate to the first location by searching the known locations of users for locations that are within a threshold distance of the first location. The known locations of a user may be determined by the online social network based on the user's use of a client system that has sent its geographical location to the online social network, based on the user checking-in at the geographical location, based on identifying the user's voice at the geographical location via voiceprint analysis, or based on other techniques described herein….
>
> [T]he social-networking system may identify the unknown user as a second user of the online social network based on a comparison of the audio input to one or more voiceprints of one or more candidate users stored by the online social network, respectively, wherein each voiceprint comprises audio data for auditory identification of a unique user of the online social network, and wherein each candidate user is within a threshold degree of separation of the first user within the online social network….
>
> [T]he social-networking system may send customized content to one or more of the first user or the second user based on their social-networking information…. [T]he customized content may comprise content associated with the first location…. [T]he social-networking system may generate the customized content based on one or more interests of the first user or the second user, wherein the one or more interests are received from the online social network…. [T]he

[9] *Id.* at 32 (diagram numbers omitted).

> customized content may comprise content having one or more topics that match the interests of the first user or the second user…. [T]he customized content may comprise advertisements, news feeds, push notifications, place tips, coupons, suggestions, or a combination thereof.[10]

44. The 2020 Voiceprint Patent provided examples of how audio of multiple people can be captured from a device that is connected to a known (authenticated) Facebook user, which Defendant can compare to stored voiceprints to identify the second person and push content to both:

> [W]hen multiple speakers are detected in audio input received by a client device of the social-networking system, the social-networking system may use voiceprint analysis to identify social network users who are connected to a known seed user, such as an authenticated user, e.g., the owner of a listening phone, and then send content to one or more of the social network users based on their interests. For example, suppose that two users, Marsha and Jan, are friends and are watching TV at Marsha's house. Marsha is an authenticated user of the TV at her house. A media device associated with the social-networking system (e.g., a dongle in communication with the TV) receives Jan's voice, and the social-networking system identifies Jan based on her voiceprint and on her social-graph connection to Marsha. Content or advertisements may then be provided to the users (e.g., to the TV, to Jan or Marsha's phone, etc.), and the content or advertisements may be customized to the interests of Marsha and Jan (e.g., the TV recommends a show or displays an advertisement for a product that both users are interested in). Content or advertisements may be provided to a group of three or more users if at least one of the users is an authenticated user.[11]

45. The 2020 Voiceprint Patent also provided examples of how audio of multiple people can be captured from a device that is not connected to a known (authenticated) Facebook user, which Defendant can still acquire, then compared to stored voiceprints to identify the people so that Defendant can push customized content to both people:

> [T]he social-networking system may use a process similar to that described above when the client device that detects speaking users is not authenticated to any of the speakers (for example, a BLUETOOTH beacon in a public place). As an example, suppose

[10] *Id.* at 33-34 (diagram numbers omitted).

[11] *Id.* at 32 (diagram numbers omitted).

> that Velma and Daphne walk into a store. Velma is known to be at the store (e.g., she opens a mobile application from the store on her smartphone). A beacon at the store may then detect Daphne speaking, and the social-networking system may identify Daphne based on a voiceprint analysis of Daphne's voice and based on Velma and Daphne being socially connected. This identification may occur even if the social-networking system does not otherwise detect Daphne's presence in the store (e.g., because location services, GPS, or the like are disabled or nonfunctional on her phone). The social-networking system may then send content or advertisements (e.g., a 2-for-1 coupon to the store; or an ad for a nearby store that may have relevance to both users) to Velma's and/or Daphne's device. Thus, in Daphne's case, content customized for Daphne's location may be sent to her despite her location services or GPS being disabled or non-functional.[12]

46. The 2020 Voiceprint Patent provided an example of another scenario by which Defendant can more easily identify users with their voiceprints by limiting the pool of users for the voiceprint comparison based on an event:

> [I]dentification of users may also be applied to an event, in which case the event may correspond to a seed concept. For example, suppose that a restaurant invites people to an event, and 100 users confirm their attendance through the social-networking system. The restaurant has a BLUETOOTH beacon, and users may be identified by comparing their captured voices to stored voiceprints for the 100 attendees (as well as friends of the 100 attendees). In this way, the social-networking system need not compare captured voices to the voiceprints of social-network users who are not attendees at the event. Instead, the search space for the voiceprint comparison may be reduced from a large number of users of the social-networking system to the relatively small number of users who are associated with the event, such as the users who have confirmed their attendance on the social-networking system, and optionally their friends. Once attendees are identified, the social-networking system may present information to them that is tailored to their interests.[13]

47. The 2020 Voiceprint Patent provided an example of how users can be identified even when the audio is obtained by a device with no authenticated users connected to it:

> While the processes described above may involve a seed user or a seed concept, it is possible that initially there are no authenticated users. For example, suppose a user walks into a store and the location services or GPS on the user's client device are not active

[12] *Id.* at 32-33 (diagram numbers omitted).

[13] *Id.* at 33 (diagram numbers omitted).

> (e.g., BLUETOOTH is turned off and the client device does not have a good GPS signal). The BLUETOOTH beacon in the store receives the user's voice and the social-networking system identifies the user based on a comparison to voiceprints in the system. The system may compare the user's voice with many voiceprints to find a match. Alternatively, the system may apply filtering criteria based on time or location, e.g., to only consider voiceprints of users who have a recent location within a particular distance of the BLUETOOTH beacon.[14]

48. Accordingly, the 2020 Voiceprint Patent protected a method of, and software and processors for, using audio input of an unknown Facebook user (received by a known Facebook user) to identify the unknown Facebook user by comparing the audio input to the user's stored voiceprint:

> What is claimed is:
>
> 1. A method comprising, by one or more computing devices of an online social network:
>
> receiving, from a client system of a first user of the online social network, a first audio input from an unknown user;
>
> identifying one or more candidate users, wherein each candidate user is a user of the online social network within a threshold degree of separation of a known user;
>
> determining, for each candidate user, a proximity of the candidate user to the known user;
>
> calculating, for each candidate user, a probability score representing a probability that the unknown user is the candidate user, wherein the probability score is based on the proximity of the candidate user and a ***comparison of the first audio input to a voiceprint of the candidate user stored by the online social network, wherein each voiceprint comprises audio data for auditory identification of the candidate user***; and identifying one of the candidate users as being the unknown user based on the calculated probability scores of the candidate users.
>
> * * * *
>
> 14. One or more computer-readable non-transitory storage media embodying software that is operable when executed to:

[14] *Id.* (diagram numbers omitted).

> receive, from a client system of a first user of an online social network, a first audio input from an unknown user;
>
> identify one or more candidate users, wherein each candidate user is a user of the online social network within a threshold degree of separation of the first a known user;
>
> determine, for each candidate user, a proximity of the candidate user to the known user;
>
> calculate, for each candidate user, a probability score representing a probability that the unknown user is the candidate user, wherein the probability score is based on the proximity of the candidate user and a comparison of the first audio input to a voiceprint of the candidate user stored by the online social network, wherein each voiceprint comprises audio data for auditory identification of the candidate user; and identify one of the candidate users as being the unknown user based on the calculated probability scores of the candidate users.[15]

49. On July 13, 2023, Defendant filed a patent application that incorporated, and was a continuation of the 2020 Voiceprint Patent, the 2022 Voiceprint Patent, and the May 2023 Voiceprint Patent (the "July 2023 Voiceprint Patent Application").

50. The July 2023 Voiceprint Patent Application was substantially similar to the prior Voiceprint Patents, but made additional claims related to Defendant's method, software, and processors for identifying a second user from audio received from a *location*, rather than from a known first user, and sending customized content using Facebook interest information associated with the first or second user:

> What is claimed is:
>
> 1. A method comprising:
>
> receiving, from a client system at a first location, an audio input from an unknown user;
>
> identifying a first user who is proximate to the first location;
>
> identifying the unknown user as a second user based on a comparison of the audio input to one or more voiceprints of one or more candidate users accessible by the client system, respectively, wherein each voiceprint

[15] *Id.* at 51-52 (emphasis added). *See also id.* at ¶ 17 (claiming processors to perform the functions described above, including the "comparison of the first audio input to a voiceprint of the candidate user stored by the online social network").

comprises audio data for auditory identification of a unique user, and wherein each candidate user is a contact of the first user; and

sending customized content to one or more of the first user or the second user, wherein the content is customized using interest information associated with the first or second user.

* * * *

3. The method of claim 1, further comprising generating the customized content based on one or more interests of the first user or the second user, wherein the one or more interests are accessed from an online social network.

4. The method of claim 3, wherein the customized content comprises content having one or more topics that match the interests of the first user or the second user.

5. The method of claim 1, wherein the customized content comprises advertisements, news feeds, push notifications, place tips, coupons, suggestions, or a combination thereof.

6. The method of claim 1, wherein the client system is a mobile phone, a Bluetooth beacon, or a media device operable to receive audio input.[16]

## IV. Meta Accesses, Possesses, Creates, Collects, Captures, Obtains, and Uses Biometric Information Including Voiceprints

51. A number of Defendant's features allow it to access and collect audio of users' voices. For example, Defendant's Messenger, which allows parties to send messages to one another, allows a user to utilize voice to text dictation, create and send voice messages, record/send videos with sound, and make voice and video calls. Facebook likewise allows users to search Facebook using a voice search and record and/or upload audio or videos with audio.

52. Defendant receives the audio input from users when they utilize an audio function on Facebook or Messenger, including when they dictate a text message to send via Messenger, send an audio recording via Messenger, make calls via Messenger, or provide audio data on Facebook, such as dictating a Facebook search, inputting their name pronunciation, posting an audio file, or posting a video that includes audio.

[16] July 2023 Voiceprint Patent Application, p. 27-28 *See also id.* at 28 (claiming software and processors to carry out the method of claim 1).

53. The audio input received by Defendant can contain the voice of the person using the function or the voice of a person in the background.

54. Sometimes, a microphone is required to record audio or conduct a voice search. If the microphone function on a cell phone is turned off when a user seeks to utilize one of these audio functions on Messenger, Defendant asks to "access the microphone," with a pop up that states: "'Messenger' Would Like to Access the Microphone. Messenger uses your device's microphone so you can do things like record video with sound, make voice and video calls, and create voice messages."




55. The pop-up does not refer to any privacy policy, mention biometric data, or seek consent related to biometric data or voiceprints.

56. At least in 2023, and upon information and belief, for many years prior, Defendant has been accessing, capturing, creating, collecting, storing, and using voiceprints and other biometric information of Facebook and Messenger users from audio data received via Facebook or Messenger.

57. Upon information and belief, Defendant not only accesses, captures, creates, collects, stores, and uses voiceprints and related biometric information of users who themselves speak or upload audio via Facebook or Messenger; it also accesses, captures, creates, collects,

stores, and uses voiceprints and related biometric information of users whose voices are included in audio uploaded by others via Facebook or Messenger.

58. From the audio input into Facebook or Messenger or otherwise received by Defendant, Defendant creates, captures, collects, stores, obtains, and uses encoded digital data of the acoustic signals of the speaker's voice ("Digital Voice Data").

59. Defendant processes the Digital Voice Data with an acoustical model, which is a model of the relationship between the audio signals and the sounds of phonetic units in the language.

60. The acoustical model is trained, and further refined, using the voice of a particular user, such that the acoustical model can be used to recognize that user by voice.

61. The acoustical model is further trained using the voices of many users to produce a speaker-independent model capable of recognizing multiple users by their voice.

62. Upon information and belief, Defendant utilizes methods such as neural networks and deep learning models trained to extract distinctive characteristics of voices from the Digital Voice Data, such as the frequency pattern, frequency range, intonation, pitch, and accent, which output additional data based on the Digital Voice Data that can be and are used to identify an individual (the "Voice Characteristics").

63. Defendant thus accesses, creates, captures, collects, stores, obtains, and uses these Voice Characteristics.

64. Upon information and belief, Defendant further creates and stores "Voice Profiles" for individual users, which store data specific to each individual user for use in subsequently recognizing each user by voice.

65. The Digital Voice Data that Defendant accesses, creates, captures, stores, obtains, and uses is a dataset, unique to an individual, that, combined with other data and tools at Defendant's disposal, is capable of identifying that individual.

66. Moreover, the Digital Voice Data that Defendant accesses, creates, captures, collects, stores, and/or obtains actually used by Defendant to identify people.

67. Defendant's most recent privacy policy acknowledges that voice recordings can be used to identify a person. *See* Meta United States Regional Privacy Notice[17] (Defendant may collect "voice recordings which may be used to identify you….").

68. Accordingly, the Digital Voice Data accessed, created, captured, collected, stored, obtained, and used by Defendant constitutes a voiceprint. Plaintiff was never aware of and did not consent to Defendant's creation, capture, collection, storage, obtaining, or use of such voiceprints.

69. Alternatively, the Voice Characteristics, and/or Voice Profiles constitute voiceprints.

70. Alternatively, the acoustical model, Voice Characteristics, and/or Voice Profiles are information based on a voiceprint used to identify an individual.

71. Upon information and belief, Defendant accesses, creates, captures, collects, stores, obtains, and uses other data that is based on a voiceprint and used to identify an individual, which additionally constitutes "data" under the CDAFA.

72. Upon information and belief, Defendant uses the voiceprints and related biometric information in its possession to improve its voice recognition and identification methods, software, processors, and machine learning; to improve its products and product development for hardware and software that utilize voice recognition, such as user authentication features; and to identify users so that it can send them customized, targeted content, including targeted advertisements.

73. Accordingly, Defendant uses voiceprints and related biometric information in its possession for profit in its targeted advertising business.

**V. Defendant's Inadequate Disclosures Regarding Voiceprints**

74. Defendant's website purports to give users clear and easy access to information about data it collects, but its statements regarding privacy are contained on multiple webpages, popups, and supplemental terms, including in Defendant's Privacy Center, an "Access Your Information" section within one's Facebook account, a Privacy Policy, and a United States Regional Privacy Policy.

---

[17] https://www.facebook.com/privacy/policies/uso/ (last visited Dec. 2, 2025).

75. Nowhere in these webpages, or anywhere else on its website, does Defendant obtain permission for use of Plaintiff's and Class members' data as required by the CDAFA.

**A. Defendant's Privacy Center**

76. Defendant's website contains a "Privacy Center" describing in general terms the information it collects.




77. The Privacy Center contains a heading called "Collection," which states "View and manage the info we've collected about you."[18]

78. Clicking "Get Started" leads to a new webpage that states: "Collecting your information helps us create better experiences on our products, so you can discover more of what you love. But we know many people want options to manage the information we've collected, so let's talk about the control you have."[19]

79. The webpage has links with menus that open popup windows for more information, shown in the screenshot below. One heading invites the user to "Learn about information we collect." Another states: "Are Facebook and Instagram listening to your conversations?" The next states: "How can you delete your information." There is also a button to "Review your information." Other links reference the Privacy Policy, suggesting that is where users can find out

[18] Meta Privacy Center Home, https://www.facebook.com/privacy/center (last visited Nov. 26, 2025).

[19] https://www.facebook.com/privacy/guide/collection (last visited Nov. 26, 2025).

"What information do we collect?" and "How you can manage or delete your information." Other links state: "Learn how we use your information" and "Manage the types of ads you see."



Collection

View and manage the info we've collected about you

Collecting your information helps us create better experiences on our products, so you can discover more of what you love. But we know many people want options to manage the information we've collected, so let's talk about the control you have.

Review your information

Learn about information we collect >

Are Facebook and Instagram listening to your conversations? >

How can you delete your information? >

Learn more in the Privacy Policy

What information do we collect?
Privacy Policy >

How can you manage or delete your information
Privacy Policy >

More resources

Learn how we use your information
Use >

Manage the types of ads you see
Ads >

80. The link to "Review your information" leads to a Facebook login page. The user may log in to his or her Facebook account to obtain data Facebook provides about the user. As discussed in Section V.B below, nothing within those webpages discloses the existence of voiceprints or biometric information related thereto.

81. Clicking on "Learn about information we collect" opens a popup shown below[20] which provides another link to the Privacy Policy and links to access or download your information, both of which lead to the Facebook login page and process described above.




[20] *Available at* https://www.facebook.com/privacy/dialog/what-we-collect (last visited Nov. 26, 2025).

82. Returning to the "Collection" page and clicking "Are Facebook and Instagram listening to your conversations?" opens another popup shown below. Defendant states it is not listening to users' conversations through their microphone, but states it uses their microphone with permission for certain audio features that require a microphone. There is no mention of what data is obtained when a user uses the microphone for one of those features.




83. Returning to the "Collection" page and clicking "Learn how we use your information" opens another webpage shown below.[21]

[21] https://www.facebook.com/privacy/guide/use/ (last visited Nov. 26, 2025).



Use

## Learn what we do with the information we collect from you or receive about you

We want to help you understand how we use your information so you feel comfortable about what you share with us.

Review your information

- How we use the information we collect about you >
- How does Meta use location information? >
- What we mean when we talk about personalization >

### Learn more in the Privacy Policy

- How do we use your information
  Privacy Policy >

### More resources

- What we collect, and what you can do
  Collection >
- Manage the type of ads you see
  Ads >




84. Clicking on "How we use the information we collect about you" opens a popup shown below[22] that lists five ways Defendant uses information it collects about users before directing them to the Privacy Policy:

85. Returning to the "use" webpage and clicking "What we mean when we talk about personalization" opens a popup shown below[23] that directs users to the Privacy Policy and says, "[T]o show you things we think are relevant to you. … we use a mix of the information we've collected about you."

//

//

//

//

//

[22] *Available at* https://www.facebook.com/privacy/dialog/how-we-use-collected-information (last visited Nov. 26, 2025).

[23] *Available at* https://www.facebook.com/privacy/dialog/what-we-mean-when-we-talk-about-personalization (last visited Nov. 26, 2025).




86. In short, nothing in this part of the Privacy Center discloses or describes the existence or use of voiceprints or biometric information related thereto.

**B. Defendant's Privacy Policy**

87. Likewise, nothing in Defendant's privacy policy discloses the existence or use of

voiceprints or biometric information related thereto.

88. The Privacy Policy states: "The information we collect and process about you depends on how you use our Products. For example, we collect different information if you sell furniture on Marketplace than if you post a reel on Instagram. When you use our Products, we collect some information about you even if you don't have an account." It continues to describe "the information we collect" in categories of "Your activity and information you provide"; "Friends, followers and other connections"; "App, browser and device information"; and "Information from partners, vendors and other third parties."[24]

> The information we collect and process about you depends on how you use our Products. For example, we collect different information if you sell furniture on Marketplace than if you post a reel on Instagram. When you use our Products, we collect some information about you even if you don't have an account.
>
> Here's the information we collect:
>
> Your activity and information you provide >
>
> Friends, followers and other connections >
>
> App, browser and device information >
>
> Information from partners, vendors and other third parties >

//

//

//

//

//

//

//

[24] Meta Privacy Policy, Effective June 16, 2025, https://ww.facebook.com/privacy/policy (last visited Nov. 30, 2025).

89. Clicking "Your activity and information you provide" opens a popup shown below,[25] which explains that "activity" means anything done on a Meta Product, and includes "[c]ontent you create, like posts, comments or audio."



Your activity and information you provide

On our Products, you can send messages, take photos and videos, buy or sell things and much more. We call all of the things you can do on our Products "activity." We collect your activity across our Products and information you provide, such as:

- Content you create, like posts, comments or audio.
- Content you provide through our camera feature or your camera roll settings, or through our voice-enabled features. Learn more about what we collect from these features, and how we use information from the camera for masks, filters, avatars and effects.
- Messages you send and receive, including their content, subject to applicable law. On some Products, you can use end-to-end encrypted messages. Learn more about how end-to-end encryption works.
- Metadata about content and messages, subject to applicable law.
- Interactions with Meta's artificial intelligence technology and related metadata. For example, messages you or others receive from, share with or send to Meta's artificial intelligence technology.
- Types of content, including ads, you view or interact with, and how you interact with it.
- Apps and features you use, and what actions you take in them. See examples.
- Purchases or other transactions you make, such as through Meta checkout experiences, including credit card information. Learn more.
- Hashtags you use.
- The time, frequency and duration of your activities on our Products.
- Your photo or video selfie if you provide it when you contact us for account support.

Learn more about how to control who sees your content and what is public content.

Information with special protections

You might choose to provide information about your religious views, your sexual orientation, political views, health, racial or ethnic origin, philosophical beliefs or trade union membership. These and other types of information could have special protections under the laws of your jurisdiction.

90. Returning to the prior popup and clicking on the link to "Learn More" about "what we collect from" "our voice-enabled features" opens another popup[26] that provides an example of Defendant collecting a voice interaction with Defendant's voice-enabled assistant on its smart

[25] *Available at* https://www.facebook.com/privacy/policy?subpage=1.subpage.1-YourActivityAndInformation (last visited Nov. 30, 2025).
[26] *Available at* https://www.facebook.com/privacy/policy?annotations[0]=1.story.3-WhatWeCollectFrom&subpage=1.subpage.1-YourActivityAndInformation (last visited Nov. 30, 2025).

glasses product. There is no mention of voiceprints or related biometric data, or of such information obtained from Facebook or Messenger.

91. In sum, the Privacy Policy does not disclose that Defendant creates, captures, collects, obtains, and utilizes voiceprints or related biometric information.

**C. Defendant's United States Regional Privacy Notice**

92. Near the top of the Privacy Policy is a sentence stating: "Read the United States Regional Privacy Notice for more details about how we handle Personal Information and how to exercise your rights."[27]

> **What is the Privacy Policy and what does it cover?**
>
> Effective June 16, 2025 | View printable version | See previous versions
>
> Read the United States Regional Privacy Notice for more details about how we handle Personal Information and how to exercise your rights.

93. The Privacy Policy does not indicate that the United States Regional Privacy Policy is applicable to all U.S. residents or that it contains supplemental terms to the Privacy Policy.

94. Prior to May 23, 2025, clicking on the link led to a "California Privacy Notice," which was applicable only to California residents.[28]

[27] Meta Privacy Policy, Effective June 16, 2025, https://ww.facebook.com/privacy/policy (last visited Nov. 30, 2025). *Available at* https://www.facebook.com/privacy/policies/

[28] *Available at* https://www.facebook.com/privacy/policies/uso/version/20220726/ (last visited Nov. 30, 2025).

95. As of May 23, 2025, clicking on the link in the Privacy Policy to "United States Regional Privacy Notice" (the "U.S. Privacy Notice") reveals additional terms that "supplement[]" Defendant's Privacy Policy for all people living in the United States.[29]

## United States Regional Privacy Notice

## About this Notice

Effective May 23, 2025 | **View printable version** | **See previous versions**

Read the **Washington and Nevada Consumer Health Data Privacy Policy** for more details about how we handle "Consumer Health Data" under the Washington My Health My Data Act and the Nevada Health Privacy Act.

This United States Regional Privacy Notice ("Notice") is for people living in the United States and supplements the Meta **Privacy Policy**, the **Meta Payments Inc. Privacy Policy**, the **Meta Viewpoints Privacy Policy**, and the **Opensource Privacy Policy**. For Portal, Facebook View, and Meta Platforms Technologies products, please see their **U.S. Regional Privacy Notice.**

96. The U.S. Privacy Notice purports to explain how Defendant collects, uses, and discloses Personal Information and "describes how to exercise your rights under applicable U.S. privacy laws".[30]

This Notice explains how we, Meta, collect, use, and disclose your Personal Information. It also describes how to exercise your rights under applicable U.S. privacy laws.

97. The U.S. Privacy Notice explains that the term "Personal Information" means "information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked with you, directly or indirectly."[31]

98. The U.S. Privacy Notice states that Defendant "process[es] information about you, including Personal Information, whether or not you have an account or are logged in."[32]

[29] U.S. Privacy Notice, Effective May 23, 2025, *available at* https://www.facebook.com/privacy/policies/uso/version/5555449491171442/ (last visited Nov. 30, 2025).

[30] U.S. Privacy Notice, Effective July 1, 2023,https://www.facebook.com/privacy/policies/uso/ (last visited Aug. 8, 2023).

[31] *Id.*

[32] *Id.*

99. The U.S. Privacy Notice states that Defendant "may disclose your Personal Information for business purposes…."[33]

100. The U.S. Privacy Notice provides a "summary" of "[t]he categories of Personal Information we may have collected about you over the past 12 months," "[h]ow we may use your Personal Information," and "[t]o whom we may have disclosed that information."[34]

101. The categories of Personal Information collected include:

- Identifiers;
- Photos and videos, which may include face imagery;
- Internet or other electronic network activity information, including browser and app logs, content you view or engage with, and app, browser and device information;
- Location-related information; and
- Audio or visual information, including photos, videos, and voice recordings.[35]

102. The U.S. Privacy Notice continues, explaining that Defendant may also collect additional "sensitive personal information" (as defined by applicable U.S. privacy laws), including:

- Social security, driver's license, state identification card or passport number;
- The content of messages you send and receive;
- Information about your health; and
- Face imagery or ***voice recordings which may be used to identify you when you use relevant features***.[36]

103. This is the first time Defendant revealed in any of its communications directed to Defendant's users, albeit vaguely, that it can use audio of voices to identify users.

104. A screenshot showing the statements quoted in paragraphs 104-107 is shown below:[37]

---

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *Id.* (emphasis added)

[37] *Id.*

| Categories of Personal Information we collect may include: | Examples of how Personal Information may be used include: | Parties with whom each category of Personal Information may be disclosed include: |
|---|---|---|
| ▪ Identifiers;<br>▪ Characteristics of protected classifications;<br>▪ Commercial information;<br>▪ Photos and videos, which may include face imagery;<br>▪ Internet or other electronic network activity information, including browser and app logs, content you view or engage with, and app, browser and device information;<br>▪ Location-related information;<br>▪ Audio or visual information, including photos, videos, and voice recordings;<br>▪ Professional or employment information;<br>▪ Education information;<br>▪ Information derived from other Personal Information about you, which could include your preferences, interests, and other information used to personalize your experience; and<br>▪ Other information you provide<br><br>We may also collect sensitive personal information (as defined by applicable U.S. privacy laws), which may include:<br>▪ Social security, driver's license, state identification card or passport number;<br>▪ Precise geolocation;<br>▪ Information about your racial or ethnic origin or religious views or union membership;<br>▪ The content of messages you send and receive, which are considered sensitive personal information under CCPA;<br>▪ Information about your sexual orientation;<br>▪ Information about your health;<br>▪ Information about your citizenship, immigration status or national origin;<br>▪ Information about your status as transgender or non-binary; and<br>▪ Face imagery or voice recordings which may be used to identify you when you use relevant features. | ▪ Providing, personalizing, and improving our products, including to show you ads;<br>▪ Providing measurement, analytics, and other business services;<br>▪ Promoting safety, integrity, and security;<br>▪ Providing marketing communications to you;<br>▪ Communicating with you; and<br>▪ Researching and innovating for social good.<br><br>For categories of sensitive personal information that we collect, we will only use or disclose it either with your specific consent when required, or as otherwise permitted by law, including the CCPA. Learn more about the permitted purposes under CCPA. | ▪ People and accounts you share and communicate with;<br>▪ People and accounts with which others share or reshare content about you;<br>▪ If you're connected to a supervised account user, parents or guardians of the supervised account users who you are connected to;<br>▪ Apps, websites, and third-party integrations on or using our products;<br>▪ New owners in the event of a change of ownership or control of all or part of our products or their assets changes;<br>▪ Partners, including partners offering goods and services on our products, as explained in our Privacy Policy;<br>▪ Vendors, including measurement and marketing vendors;<br>▪ Service providers;<br>▪ Third parties, including external researchers and academics;<br>▪ Law enforcement or other third parties in connection with legal requests, to comply with applicable law or to prevent harm; and<br>▪ The Meta Companies. |

105. The U.S. Privacy Notice does not seek any affirmative assent prior to obtaining voiceprints or related biometric data of California residents.

106. Rather, as shown in the screenshot below, the U.S. Privacy Policy indicates opt-out requests and other actions a user must take to limit the use of biometric data (assuming he or she knows it is being collected).[38]

### How can you exercise your rights provided under applicable U.S. privacy laws?

Depending on where you live and subject to certain exceptions, you may have some or all of the following rights:

- **Right to Know:** The right to request that we disclose to you the Personal Information we collect, use, or disclose, and information about our data practices. For residents of certain states, this may include a list of third parties (as defined by applicable law) to whom we have disclosed your Personal Information.
- **Right to Request Correction:** The right to request that we correct inaccurate Personal Information that we maintain about you.
- **Right to Request Deletion:** The right to request that we delete your Personal Information that we have collected from or about you.
- **Right to Opt Out of Targeted Advertising:** The right to opt out of the processing of your Personal Information for purposes that may be considered "targeted advertising" under applicable U.S. privacy laws, including information obtained from your activities on nonaffiliated websites or online applications.
- **Right to Non-Discrimination:** The right not to receive discriminatory treatment for exercising your privacy rights.

To submit a request to exercise your rights, and as applicable, to appeal a consumer rights action, please visit this webform.

Here's how you can exercise the right to opt out of targeted advertising:

- For ads you see through Meta Products, visit the "Activity information from ad partners" section in Ad Preferences or visit the "Accounts" section in Accounts Center to control how your info is combined and used across your accounts, including for ads.
- Depending on where you live, you may also see ads on other apps and websites about Meta Products or services which use your activity on Meta products to tailor the ad. If you have an account with Meta, you can control whether you see these ads when you visit the section titled "Ads about Meta" in Ad Preferences. If you do not have an account, you can use the Digital Advertising Alliance and/or the NAI industry opt-out platforms, along with your mobile device advertising settings offered by the device manufacturer. Certain ad blockers and tools to restrict cookies can interfere with your ability to opt out through the industry opt out platforms. Different device manufacturers provide different ways to opt out.
- Depending on where you live, you may have the right to opt out of targeted advertising through a Global Privacy Control (GPC) enabled browser setting. If you have this right, when you visit and log in to our websites in a GPC-enabled browser, we will treat our initial receipt of the GPC signal as a valid request to opt-out of targeted advertising, as defined by applicable U.S. privacy laws granting this right. Please note that if you are logged out, our processing of the signal will be limited to the specific browser that you are using. You may need to renew your opt-out choice if you use a different browser to access our websites. Other than GPC, we do not recognize any "do not track" signals.

Please note that to protect your information and the integrity of our products, we may need to verify your identity before processing your request. In some cases, we may need to collect additional information to verify your identity, such as a government issued ID.

Under certain U.S. privacy laws, you may also designate an authorized agent to make these requests on your behalf through the webform, whether or not you have an account. If you use an authorized agent to submit a request, we may need to collect additional information, such as a government issued ID, to verify your identity before processing your request to protect your information. In most cases, we will facilitate your request through automated tools available through your password-protected account.

For information on the CCPA requests we have received, please see here.

107. The CDAFA, however, does not require California residents to take action to stop or limit the collection of biometric data; rather, it requires Defendant to obtain informed consent and *before* uses such data.

[38] *Id.*

108. Defendant's failure to comply with the CDAFA as set forth herein violated Plaintiff's and Class Members' privacy rights, and the harm to Plaintiff and the Class occurred in California. *Cf. Cothron v. White Castle Sys., Inc.*, 477 F. Supp.3d 723, 732 n.7; *In re Facebook Biometric Info. Privacy Litig.*, 326 F.R.D. 535, 547–48 (N.D. Cal. 2018).

**VI. Plaintiff's Experience**

109. Plaintiff has a Facebook account and utilized Defendant's Messenger app.

110. In 2025 and throughout the Class Period, Plaintiff has, for personal use, input his voice into an audio function on Facebook or Messenger, including, making audio calls via Messenger.

111. Plaintiff allowed Facebook and Messenger to access audio of his voice for the limited purpose of communicating through those applications.

112. During the Class Period, Defendant accessed, created, collected, captured, stored, obtained, and used Plaintiff's voiceprint and related biometric information for profit.

113. Defendant did not obtain consent from Plaintiff before it accessed, created, collected, captured, stored, obtained, and used Plaintiff's voiceprint and related biometric information.

## **CLASS ACTION ALLEGATIONS**

114. Plaintiff brings this class action on behalf of himself and all others similarly situated, as representative of the following class:

> All persons in California whose Digital Voice Data, Voice Characteristics, and/or a Voice Profile were accessed, collected, stored, and used by Defendant.

115. Excluded from the Class is any Defendant, its parents, subsidiaries, affiliates, predecessors, successors, officers, directors, and the immediate family of such persons. Also excluded are any trial judge who may preside over this action, court personnel and their family members, and any juror assigned to this action.

116. Plaintiff is a member of the Class he seeks to represent.

117. Plaintiff reserves the right to amend or modify the Class definitions with greater specificity or division into subclasses after having had an opportunity to conduct discovery.

118. The Class Period is that period within the statute of limitations for this action and extending until a Class is certified herein.

119. The Class is certifiable under California Code of Civil Procedure Section 382.

120. **Numerosity.** The members of the Class are so numerous that joinder of all members is impracticable. The determination of the numerosity factor can be made from Defendant's records.

121. **Typicality.** Plaintiff's claims are typical of the claims of the Class Members. Plaintiff and all Class Members have had their rights under the CDAFA violated based on Defendant's failure to comply with the provisions of the CDAFA.

122. **Commonality and Predominance.** There are questions of law and fact common to the Class, which predominate over any questions affecting individual members of the Class. These common questions of law and fact include, without limitation:

a. Whether Defendant accessed, possessed, created, collected, captured, stored, obtained, and used biometric identifiers or biometric information of Plaintiff and the Class;

b. Whether Defendant informed Plaintiff and the Class that it was collecting their biometric identifiers or biometric information;

c. Whether Defendant informed Plaintiff and the Class of the specific purpose for which it was collecting their biometric information;

d. Whether Defendant obtained Plaintiff's and the Class members' consent to access, possess, create, capture, store, obtain, and use their biometric identifiers or biometric information;

e. Whether Defendant sold, leased, traded, or otherwise profited from the biometric identifiers or biometric information of Plaintiff and the Class;

123. **Adequacy.** Plaintiff is a member of the Class he seeks to represent, is committed to the vigorous prosecution of this action, and has retained competent counsel experienced in the prosecution of class actions. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Class.

124. **Superiority.** A class action is an appropriate method for the fair and efficient adjudication of this controversy and is superior to all other available methods. Because the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Defendant, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, Class members will continue to suffer harm and Defendant's misconduct will proceed without remedy. Even if Class members could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard that might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court. Finally, Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the Comprehensive Data Access and Fraud Act ("CDAFA")
### Cal. Penal Code § 502, *et seq.*

125. Plaintiff incorporates by reference each and every allegation set forth above.

126. Plaintiff brings this claim individually and on behalf of the Class.

127. Cal. Penal Code § 502 provides: "For purposes of bringing a civil or criminal action, a person who causes, by any means, the access of a computer, computer system, or computer network in one jurisdiction from another jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction."

128. Defendant violated Cal. Penal Code § 502(c)(2) by knowingly accessing and without permission taking, copying, analyzing, and using Plaintiff's and Class members' data.

129. Plaintiff and Class members suffered economic injury because Defendant unjustly profited from Plaintiff's biometric information.

130. It would not be equitable to allow Defendant to keep those profits, which were generated by violating Plaintiff's privacy interests.

131. As a direct and proximate result of Defendant's unlawful conduct within the meaning of Cal. Penal Code § 502, Defendant has caused loss to Plaintiff and the Class members in an amount to be proven at trial.

132. Plaintiff, on behalf of himself, and the Class members, seek compensatory damages and/or disgorgement in an amount to be proven at trial, and declaratory, injunctive, or other equitable relief.

133. Plaintiff and the Class members are entitled to punitive damages because Defendant's violations were willful and, upon information and belief, Defendant is guilty of oppression, fraud, or malice.

134. Plaintiff and the Class members are also entitled to recover their reasonable attorneys' fees pursuant to Cal. Penal Code § 502(e).

## PRAYER FOR RELIEF

135. WHEREFORE, Plaintiff individually and on behalf of all others similarly situated, seek judgment against Defendant as follows:

a. For an order certifying the putative Class and naming Plaintiff as the representative of the putative Class and Plaintiff's attorneys as Class Counsel to represent the putative Class members;

b. For an order declaring that the Defendant's conduct violates the statutes referenced herein;

c. For an order declaring that Defendant's conduct violates the statutes referenced herein;

d. For an order finding in favor of Plaintiff and the putative Class on the count asserted herein;

e. For damages and/or disgorgement in amounts to be determined by the Court and/or jury;

f. For prejudgment interest on all amounts awarded;

g. For injunctive relief as pleaded or as the Court may deem proper; and

h. For an order awarding the Plaintiff and the putative Class their reasonable attorneys' fees and expenses and cost of suit.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all claims so triable.

Dated: January 20, 2026

**BURSOR & FISHER, P.A.**

By: ______________________

L. Timothy Fisher (State Bar No. 191626)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com

*Attorneys for Plaintiff*